**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 12, 2014**

# In the Court of Appeals of Georgia

A13A2423. LEWIS v. THE STATE.

BOGGS, Judge.

A jury found Moses Lewis guilty of aggravated assault, but acquitted him on a count of false imprisonment. Following the denial of his amended motion for new trial, Lewis appeals, citing several claims of error. Because the trial court erred in allowing the testimony of an officer recalled by the State, we reverse.

The evidence showed that the victim and her boyfriend Lewis had lived together for several years when their relationship became strained. She testified that when Lewis began receiving a disability check, he would disappear for a day or so, return home, and the two of them would argue. She admitted to "grab[bing]" Lewis during these arguments, but explained she never hurt him.

On July 4, 2009, the victim was sitting on the bed when Lewis entered the room and said to her, "B**ch, you're going back to your old man? . . . I'm going to kill you," then "jumped on [her]" so that she couldn't move, and stabbed her in the abdomen with a knife. Lewis immediately "said he was sorry," but attempted to stab the victim again. She explained that she and Lewis were "tussling," and she told Lewis "please don't do it again." The victim told him, "don't let me die in the house like this, don't let my kids come home and see me die like this." Lewis again told her "he was sorry," but continued to attempt to stab her. When the victim told Lewis, "please, let's talk about this. I ain't going to call the police, just leave," Lewis let her up, and she instructed him "to go to the house in the back." Lewis walked out and the victim sought help from her uncle who lived nearby.

The officer that arrived on the scene testified that he observed the victim on the ground with a small wound, slightly bleeding, on the left side of her hip. He explained that the victim "was basically in a state of shock," and that she told him that Lewis called her a b**ch, "pushed her down on the bed and then he stabbed her." While Lewis was taken into custody later the same day by other officers, the officer that responded to the victim did not see Lewis after the incident or after he was taken into custody.

Lewis testified in his own defense and claimed that the victim was the aggressor. He stated that he was sitting on the side of the bed opening a letter with a "file . . .with a point on the end" when the victim came into the room to talk to him and "got upset because [Lewis] wasn't paying her no attention." Lewis claimed the victim hit him on the side of his face and straddled him after he fell back onto the bed. He explained that she hit him "so hard, she knocked the earring out of this side of my ear."

Lewis explained further, "it was happening all over again. I mean, that's not the first time it happened." He testified: "I still had the opener in my hand, and I was twisting. But I couldn't move . . . I kept asking her to let me up . . . and get off me . . . But she wouldn't. So I stuck her with the little - - the thing I had in my hand, I stuck her with it. And I did that to get her off me." Lewis stated that he knew the victim "was going to keep hitting [him]," and that if she had sat on him any longer, "something bad was going to happen to [his] body itself." He claimed that he could not "move her away," because "she's too much weight." The victim testified that she was 5'6" tall and weighed 200 lbs. Lewis stated that he weighed 140 lbs. at the time of the incident. He explained that he had had surgery on his shoulder and back in the past year and could not "physically tussle with anybody."

3

1. Lewis contends that the trial court erred in allowing the officer to testify "about his opinion on the behavior of 'geeked up,' intoxicated individuals and individuals suffering from mental illness." We agree.

> The admission of evidence is a matter which rests largely within the sound discretion of the trial judge; and if an item of evidence has a tendency to establish a fact in issue, that is sufficient to make it relevant and admissible. Unless the potential for prejudice in the admission of evidence substantially outweighs its probative value, the Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value.

(Citations omitted.) *Sanchez v. State*, 321 Ga. App. 333, 334 (741 SE2d 660) (2013).

Following Lewis's testimony, the State recalled the officer who arrived at the scene and discovered the victim. The State asked the officer the following series of questions:

> Q: . . .you are still under oath. You've indicated how long you've been a police officer. Have you dealt with individuals that have been geeked up or high during the course of your duties?
> A: Yes, I have.
> Q: What is your experience as a police officer with regard to dealing with those individuals?
> A: At the time, they're hostile.

4

Defense counsel then objected, "Judge, I'm going to object to this line of questioning. It is not pertinent." The trial court asked both counsel to approach the bench, and the following colloquy took place:

> Defense counsel: Judge, [the officer] said that he never spoke with Mr. Lewis or met with him or saw him that day, so I don't see how he has anything to offer this jury. . . I mean, he's going to testify about his common knowledge about people who are drinking. Well, that's within the layperson's knowledge. He didn't - - there's no evidence that Mr. Lewis was drinking that day that . . . [the officer] saw. So I would ask that this be excluded.
> Court: Well, [the victim] testified that he appeared to be geeked up.
> Defense counsel: But that's her testimony, Judge, but [the officer] didn't observe that and he can't testify - -
> Court: Well, you can elicit that on cross-examination. I'm going to allow it.

The State then continued to question the officer regarding his experience with other individuals:

> Q: . . ., with regard to your experience as a police officer in individuals who are geeked up or high, either on some type of narcotic substance or alcohol, whatever the case may be, what is your experience with regard to those individuals' ability to - - their physical actions?
> A: They become combative and they want to fight. And later when they see you in the future, they apologize and say that they are sorry.

Q: Do you have - - have you had experience with small people, 5'6", 5'8", 135 pounds, somewhere around there, that are geeked up or high on some substance?

A: Yes, I have.

Q: Have you had situations where those individuals had to have been subdued?

A: Yes, I have.

Q: Has it taken more than one police officer to do that?

A: Yes, it has.

Q: Based upon that experience, do you have any insight as to what that - - the substance, whatever it may be, narcotic, prescription med, whatever it can be, that is taken to the extent someone is geeked up or high?

Trial counsel renewed his objection to the testimony, but the trial court overruled the objection, and the State continued with its questioning of the officer:

Q: Based upon your experience and your insight into your personal circumstances having - - having dealt with individuals that are high or geeked up on some substance that they've ingested, what is your insight into what affect that has upon their physical activities or physical exertion or their ability to do that? Do you have any insight on that one way or the other?

A: Based on my experience dealing with individuals of that nature, in a case with a bipolar person, if they took their medication, they wouldn't be combative.

Q: But with regard to the effect of that substance upon the physical capabilities or physical ability of that individual or their strength, do you have any insight on that aspect of it?
A: No, I do not.

The victim testified that when Lewis attacked her, he was "[v]ery out of it, he was sweating, eyes was[sic] big. He was just out of it . . . He looked high to me. And he was just sweating, just sweating, just sweating." Lewis testified that he had been prescribed pain medication "over a period of four years," but that his doctor had "cut him off" because he had been taking the medications for too long. He explained that he had not taken any prescription medication within the past year and only used "[i]buprofen 800 milligrams" for his pain. While Lewis admitted he drank beer, he was not asked, and did not state that he drank beer on the day of the incident. He explained, "I don't drink alcohol when I'm taking my medication. I take my medication three times a day."

An officer may testify regarding his training to recognize the manifestations of drug or alcohol intoxication, but such testimony is generally allowed only when the officer has had ample opportunity to observe the demeanor of a party. See, e.g., *Sweetenburg v. State*, 197 Ga. App. 36, 37 (3) (397 SE2d 451) (1990). As explained in *Bly v. State*, 283 Ga. 453, 457 (1) (660 SE2d 713) (2008), in those cases, the

7

officer's opinion is based upon matters personally observed by the officer. Also distinguishable are cases involving the expert testimony of officers regarding their analysis of physical evidence. See id.

But the officer's testimony here, even if the proper foundation had been laid for the testimony, see *Bradley v. State*, 292 Ga. App. 737, 738 (1) n.3 (665 SE2d 428) (2008), was not relevant to the particular circumstances before the jury. While the victim testified that Lewis "looked high," the officer did not observe Lewis at any time and had no contact with him in the course of his investigation. The officer's testimony regarding his experience with "geeked up" individuals, that those individuals were combative (or not combative if they were bipolar and had taken medication), had to be subdued, and were apologetic in the future, was improper and did not have a tendency to establish any fact in issue. It did not support the victim's claim that *Lewis* was "high," and it was not relevant to rebut Lewis's testimony that he did not consume alcohol with his ibuprofen as the State argues. See *Howie v. State*, 281 Ga. App. 730, 732 (637 SE2d 134) (2006) (officer's testimony of previous experience with other domestic violence victims was not relevant to explain the conduct or testimony of the victim in the instant case). The trial court therefore erred in allowing this testimony because it did not have a tendency to establish a fact in

issue, and the probative value of the testimony was outweighed by the potential for prejudice.

Given that the case turned solely on the credibility of Lewis and that of the victim, we cannot say that it is highly probable that admission of the officer's testimony did not contribute to the verdict. See *Render v. State*, 267 Ga. 848, 850 (2) (483 SE2d 570) (1997); see also *Hill v. State*, 310 Ga. App. 695, 699-700 (2) (713 SE2d 891 (2011); compare *Buggle v. State*, 299 Ga. App. 515, 518 (1) (683 SE2d 85) (2009) (evidence of defendant's guilt was overwhelming where his testimony that he acted in self defense was belied by a video of the incident). Although it is undisputed that Lewis stabbed the victim, there was also evidence that he did so in self defense. See *Render*, supra. While the evidence was sufficient to sustain Lewis's conviction, we cannot say that it was overwhelming.

We therefore conclude that the trial court committed reversible error in allowing the officer's testimony, and we reverse Lewis's conviction and remand for a new trial.

2. In light of our holding in Division 1 reversing Lewis's conviction, we do not address his remaining enumerations of error.

*Judgment reversed and case remanded for a new trial. Doyle, P. J., and McFadden, J., concur.*